Shera SWOPE, a/k/a Edwina, a/k/a Puff, Appellant,

v.

The STATE of Texas, Appellee.

No. 3-85-193-CR.

Court of Appeals of Texas, Austin.

Dec. 17, 1986.

Rehearing Denied Feb. 11, 1987.

---

1. Also, at oral argument, Appellant's counsel strongly urged us to publish our opinion.

Again, we yield to his request.

David L. Botsford, Maloney, Gotcher & Yeager, Austin, for appellant.

Arthur C. Eads, Dist. Atty., James T. Russell, Administrative Asst., Belton, for appellee.

Before SHANNON, C.J., and GAMMAGE and CARROLL, JJ.

SHANNON, Chief Justice.

Appellant Shera Swope seeks to set aside a judgment of conviction after a jury trial in the district court of Lampasas County. Swope was convicted as a party to the offense of theft by deception. Tex.Pen. Code Ann. §§ 31.01, 31.03, & 7.02 (1974 and Supp.1986). The district court assessed punishment at confinement for twenty years and a fine of $80,000. This Court will reform and affirm the judgment.

The grand jury indicted Swope on eight counts. Each count averred that on certain dates between October 7, 1982 through December 17, 1982, Lorena Love Widmer committed theft by deception from Eslar Rutherford and that Swope:

> "... acting with the intent to promote and assist the commission of the aforesaid offense, did then and there solicit, encourage, direct, aid and attempt to aid Lorena Love Widmer to commit the said offense ..."

By her first point of error, Swope claims that the evidence is insufficient to show that Widmer committed the underlying offense of theft by deception. Tex.Pen.Code §§ 31.01, 31.03. Swope asserts that the evidence is insufficient to show: 1) that Widmer made false and deceptive statements *intentionally*, and 2) that the victim, Eslar Rutherford, was deceived by and relied upon Widmer's false statements.

 In determining the sufficiency of the evidence to support a judgment of conviction, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1974); *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983) (opinion on State's motion for rehearing). In a circumstantial evidence case, if the evidence reasonably supports an inference other than the appellant's guilt, a finding of guilt beyond a reasonable doubt is not a rational finding. *Carlsen v. State, supra.*

Some time in 1982, Eslar Rutherford became acquainted with Lorena Love Widmer and her relatives. During 1982, Rutherford and Widmer, both elderly widows, spent a great deal of time together. Widmer is Swope's aunt. Charity Harton (Widmer's sister), Swope (Widmer's niece and Harton's daughter), and Sandra Lilly were often present with Widmer and Rutherford.

From 1980 to 1983, Widmer, Swope, and other relatives, in efforts to obtain loans, told numerous persons that Widmer was the heiress of her husband's multi-million dollar Swiss estate. Depending upon the potential lender, the value of the assets of that estate ranged from one million to ten million dollars and consisted of vineyards, chocolates, watches or cuckoo clocks. Widmer made similar representations to the victim, Rutherford.

In September 1982, Widmer, with Swope's assistance, employed Belton attorney James Kreimeyer to set up a trust in which Widmer proposed to place the proceeds of her husband's estate when she received them. Widmer and Swope told Kreimeyer that Widmer was the heiress of a large estate in Switzerland which was then in probate court. In fact, only ten dollars were ever placed in the trust.

The prosecution introduced the records from the probate of the estate of Widmer's husband, who died in 1974 in Williamson County, Texas. Included in the records is a property inventory, sworn to and signed by Lorena Love Widmer, which shows the total value of her husband's estate to have been $24,000.

When Widmer and Rutherford became friends in 1982, Widmer asked Rutherford to lend her money so she could close out her husband's multi-million dollar estate and obtain the assets. In October 1982, Widmer and Rutherford visited attorney James Thompson concerning a proposed short-term $35,000 loan from Rutherford to Widmer with a $70,000 payback. Widmer told Thompson that she was heiress of a multi-million dollar estate and that she needed the Rutherford loan to pay taxes so that the estate could be settled. Widmer told Thompson to confer with James Kreimeyer who was trustee of the estate. Thompson told Rutherford that he would verify the estate and draw a promissory note, but that a one-hundred percent return was usurious and that she would have to be content with a lower interest rate.

When Thompson called, Kreimeyer told Thompson that he had no independent verification of Widmer's expectancy, but that he had set up a trust to receive the proceeds of the estate. Thompson then telephoned Rutherford and told her that he was unable to verify the existence of the estate and that he advised her against making the loan to Widmer. At this point Widmer came on the telephone and angrily denounced Thompson and accused him of being "after" her estate's money. Rutherford and Widmer never again returned to Thompson's office nor sought his advice.

Between October and December 1982, Rutherford purchased eleven cashier's checks which formed the basis of the prosecution against Swope. These checks, totalling $511,832, were cashed by Widmer at Cove State Bank in Copperas Cove. When Widmer cashed these checks, she received some cash and purchased a series of smaller cashier's checks. The prosecution intro-

duced the cashier's checks purchased by Widmer from the proceeds of Rutherford's cashier's checks. The prosecution proved that two of Widmer's checks, totalling $35,000, were deposited into the account for Swope's used furniture business, and that Swope's husband used a $9,000 check from Widmer to make a loan payment.

In November 1982, Swope told Kreimeyer that the proceeds from Widmer's estate had arrived. Swope and Widmer then proceeded to lend Kreimeyer $35,000, purportedly from the funds of Widmer's estate, but in truth from the money received from Rutherford. Kreimeyer gave Swope a promissory note payable to Swope for $35,000.

The balance of the proceeds from Rutherford's checks, over $400,000, was received by Widmer in "strapped" cash from Cove State Bank (*i.e.*, pre-counted bundles of money held together with a strap bearing the bank's name). In April 1983, Swope's husband purchased $210,000 in cashier's checks payable to the Internal Revenue Service for which he paid with strapped cash from Cove State Bank.

As might be expected, such large cash transactions attracted considerable attention at the involved banks. Nancy Mullins, manager of the Copperas Cove branch of Killeen Savings and Loan Association, testified concerning several large cashier's checks purchased by Rutherford for the benefit of Widmer. On one occasion, Mullins asked Rutherford why she was withdrawing such a large sum of money. In response, Rutherford told Mullins, with Widmer interjecting pertinent details, about Widmer's Swiss largess. Rutherford told Mullins that she was lending Widmer the money to use in settling the estate.

Late in 1982 these large cash transactions also attracted the attention of the district attorney's office. In January 1983, Andy Anderson, chief criminal investigator for that office, conversed with Rutherford and others about these transactions. During that month Anderson obtained from Rutherford a series of documents, consisting of promissory notes and letters. The

promissory notes were signed by Widmer payable to Rutherford in the sums of $35,000, $2,000,000, $40,000, $20,000, $1,000,000, and $5,000,000, respectively, and the dates of those notes correspond roughly to the dates on the cashier's checks purchased by Rutherford and payable to Widmer. The letters were from Widmer to Kreimeyer directing him as trustee of her estate to pay Rutherford amounts corresponding to the promissory notes when the proceeds from the estate were received. Kreimeyer testified that he never received any of the letters addressed to him. Anderson copied the promissory notes and letters and returned the originals to Rutherford.

In February 1983, Rutherford attempted to hire Temple attorney Bob Odom to stop the district attorney's office from "harassing" her. Rutherford's letter to Odom stated "I do not want Mr. Andy Anderson or any other District Attorneys as far as that goes [sic] any one else to call me are (or) come by my house asking about my business matters with Mrs. Widmer or any one else...." The letter to Odom shows minor alterations made in different handwriting and different colored ink, and it is plain that the envelope was addressed by someone other than Rutherford.

The day before Odom received Rutherford's letter, he received a telephone call about the same subject matter. An unidentified woman told Odom of Anderson's investigation and that Rutherford wanted it stopped. When Odom realized he was not speaking to Rutherford, he asked that she be put on the telephone, and a woman identifying herself as Rutherford came on the line. She told him the same thing about harassment from the district attorney's office.

Odom subsequently approached the district attorney's office and had a lengthy conversation with Anderson about the subject. Odom then wrote Rutherford stating that he could not advise her without making his own independent investigation into the matter. Odom told Rutherford that "you are not a potential accused in a criminal case but instead a possible victim of an offense" and that, if she desired, he would "investigate this matter independently of Mrs. Widmer or the District Attorney's office." Odom heard nothing further from Rutherford.

On October 8, 1983, Rutherford signed a typed statement which read "To whom it may concern. Eslar Rutherford do here by request and demand in case of illness or death that any or all heirs to my estate, can not file charges against Lorena Love Widmer or her estate." The statement shows to be signed by Eslar Rutherford, is notarized, and is witnessed by Charity L. Harton and Julia Ford.

On October 25, 1983, Rutherford and Widmer executed reciprocal wills, each devising her estate to the other should the other survive her. Gordon Adams, a Killeen attorney, testified that he prepared the wills at the request of Widmer and Rutherford. He testified that he interviewed both women concerning the disposition of their property and both were coherent and firm about what they wanted to do. Adams asked each woman whether she had an estate sufficiently large to encounter estate tax problems and each woman assured him that there would be no tax problem. Widmer did not mention a multi-million dollar inheritance or the $500,000 which she had received from Rutherford ten to twelve months before.

In February of 1984, Rutherford's health began failing, and, on February 20, she entered Scott and White Hospital in Temple. On the same day, Widmer called attorney James Cure and asked him to prepare an instrument giving her power of attorney for Rutherford. Cure prepared the instrument as requested and took it over to the hospital for execution. Cure testified that he had a conversation with Rutherford at the hospital and that she was coherent and knew what she was doing. Rutherford then signed the power of attorney.

On February 22, Widmer employed the power of attorney to enter Rutherford's safety deposit box at Aztec Savings and Loan in Copperas Cove. According to the safety deposit box inventory, Widmer re-

moved a legal size expandable folder, three large manila envelopes, and two abstracts of title. Jane Clayton, a secretary at the savings and loan association, testified that the folders appeared to be full of documents, but that she did not see any of the contents. Clayton stated that Widmer took most of the contents of the safety deposit box. Widmer told Clayton that Rutherford had sent her over there to get some documents, and because she did not know exactly what she was looking for she was going to take all of the documents to Rutherford.

On February 24, Rutherford died at Scott and White Hospital. The envelopes from her safety deposit box were not found in her hospital room. The promissory notes from Widmer and the letters from Widmer to Kreimeyer were not found among Rutherford's papers.

By her first point of error Swope attacks the sufficiency of the evidence to show 1) that Widmer misrepresented her inheritance *intentionally,* and 2) that Rutherford was deceived by and relied upon such misrepresentations. In sum, Swope suggests that Widmer was an eccentric old woman who might have believed her own stories and that Rutherford was so shrewd that she knew Widmer was lying to her, but that she, nevertheless, wanted to give Widmer the money.

■ There is sufficient evidence from which the jury could have concluded that Widmer intentionally misrepresented her inheritance, knowing the falsity of her representations. First, there are her deceased husband's probate records, showing only a slender estate entirely unrelated to Switzerland. These records include the inventory of the estate, sworn to by Widmer which shows a total value of $24,000.

In addition, there are inconsistencies in the tales Widmer told different persons concerning the estate. For example, she told various persons that the estate was being handled by lawyers in Dallas or in Houston. Widmer also told Dorothy McLendon, a teller at Cove State Bank, that the money she was obtaining from

Rutherford was, in fact, her own money from her estate which had been sent into the United States by way of Rutherford's bank account. Although Widmer usually referred to her inheritance as having a Swiss origin, she occasionally suggested a California provenance.

There was other evidence demonstrating Widmer's guilty knowledge and intent; for example, the letters directing Kreimeyer to repay Rutherford when Widmer's "ship came in" were never sent to Kreimeyer. Widmer never mentioned her estate to Adams, the attorney who drafted the reciprocal wills, although he specifically asked her if she had an estate large enough to encounter tax problems. Bank teller Joann McIntire testified that Widmer purchased cashier's checks of less than $10,000 each with Rutherford's money so that she could avoid filling out currency transaction reports for the federal government.

■ In addition, the State introduced evidence of five extraneous transactions involving Widmer, Swope, and other family members, in which Widmer attempted to borrow money based on her alleged bountiful legacy. Evidence that an actor has previously participated in recent transactions similar to that upon which the prosecution is based is admissible to show knowledge and intent. Tex.Pen.Code Ann. § 31.-03(c)(1) (Supp.1986).

Swope also attacks the sufficiency of the evidence to show that Rutherford relied on and was deceived by Widmer's misrepresentations. Swope points to evidence that Rutherford was warned about Widmer by at least three persons—attorney Thompson, attorney Odom and investigator Anderson. Swope, relying upon *Williams v. State,* 542 S.W.2d 131, 134–135 (Tex.Cr. App.1976), insists that these persons' warnings to Rutherford show that she knew or should have known of the falsity of Widmer's statements and, accordingly, the evidence is insufficient to show that Rutherford was deceived.

■ *Williams v. State, supra,* and other opinions relied upon by Swope, pre-

date the current Penal Code and are therefore doubtful authority in light of the extensive revision of the offense of theft in the new code. Penal Code § 31.03(a) now defines theft as appropriating property unlawfully with intent to deprive the owner of the property. Appropriation of property is unlawful if it is done without the owner's effective consent. § 31.03(b)(1). Section 31.01(4)(A) provides that consent is not effective if induced by deception or coercion. Section 31.01(2) contains five definitions of "deception," two of which are alleged in the indictment involved in this appeal. Those two definitions are:

Deception means:

(A) creating or confirming by words or conduct a false impression of law or fact that is *likely to* affect the judgment of another in the transaction, and that the actor does not believe to be true;

. . . . .

(E) promising performance that is *likely to* affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed ... (emphasis added).

■ These definitions plainly provide that deception consists of false words or conduct which is *likely* to affect the judgment of another in the transaction. Such definitions seem to establish a different standard from prior case law which focused on whether the victim actually knew or should have known of the falsity; however, we are unaware of an opinion specifically addressing the issue of whether the Penal Code changed prior law in this regard. Two post-Penal Code opinions paraphrase generally the Penal Code requirement that deception must be likely to affect the judgment of another in the transaction. *Gibson v. State,* 623 S.W.2d 324 (Tex.Cr. App.1981); *Cortez v. State,* 582 S.W.2d 119 (Tex.Cr.App.1979). This Court has not located an opinion written subsequent to enactment of the Penal Code which specifically states that the prosecution must prove the victim actually relied on the falsity in surrendering the property.

Nevertheless, as Swope suggests, the Practice Commentary to the Penal Code concludes that "[a]s in the prior law of swindling and theft by false pretext, the victim's consent must result from his reliance on the deception when he would not have consented if he knew the truth. [Citing pre-Penal Code opinions] Thus, it is not theft if the victim knows the truth and knows the actor is lying, for example, but nevertheless agrees to the transaction." Practice Commentary to § 31.03, at p. 418.

■ The reading of a "reliance" requirement into the current Penal Code may be justified under § 31.01(4)(A), which provides that consent is not effective if it is *induced* by deception or coercion. The requirement that the deception induce the consent certainly implies that the victim must both rely and act upon the deception. Accordingly, this Court concludes that the requirement that the victim rely upon the defendant's falsehoods has survived the new Penal Code and is still an element of the offense of theft by deception.

To support her contention that the evidence is insufficient to show that Rutherford relied upon and was induced by Widmer's falsehoods to give money to Widmer, Swope relies on the fact that several persons warned Rutherford about Widmer. These warnings, however, are not dispositive of the issue. Rutherford only received one warning, from attorney Thompson, prior to writing the checks for over $500,000 to Widmer. Furthermore, Thompson never told Rutherford that the multi-million dollar estate did not exist; he only told her that he could not verify its existence. Although Thompson advised her against making the loan, he did not tell her that Widmer was deceiving her.

More important, there is no evidence that Rutherford ever indicated a disbelief of Widmer's story, nor did Rutherford ever indicate that she intended the transfers to Widmer to be gifts rather than loans. To the contrary and despite the warnings, Rutherford consistently viewed her advances as loans against Widmer's estate, to be repaid out of the estate when the pro-

ceeds were received. Rutherford's possession of Widmer's promissory notes and letters to Kreimeyer are an indication that she clearly intended to document a loan transaction. Widmer's letters to Kreimeyer (which he never received) specifically instruct him, as trustee of Widmer's estate, to pay the loans from Rutherford "immediately upon receiving of funds" from the estate, and state that "[t]he date of my Estate being settled is pending."

Rutherford also indicated her belief several times in Widmer's multi-million dollar estate. For example, bank manager Nancy Mullins testified that while purchasing a cashiers check for Widmer's benefit, Rutherford repeated to her Widmer's story of a large estate from Switzerland. Mullins also testified that the advance to Widmer was intended as a loan to be repaid when Widmer's estate was settled.

Likewise, when Rutherford signed the notarized statement on October 8, 1983, she stated therein that the heirs "can not file charges or sue against Lorena Widmer *or her estate.*" This statement indicates Rutherford's continuing belief in Widmer's story about her estate. Similarly, the execution of reciprocal wills may be viewed as indicating Rutherford's belief that Widmer had an estate which she would take if Widmer predeceased her.

It is a fair conclusion that Rutherford viewed the advances to Widmer as a business transaction out of which she intended to profit. Attorney Thompson testified that when Rutherford and Widmer came to his office, they spoke strictly in terms of a loan between them and there was no indication that Rutherford intended the money to be a gift. Thompson further testified that Rutherford was interested in obtaining the maximum legal rate of return on her loan to Widmer. Even Rutherford's letter to attorney Odom asks him to prevent the district attorney's office from "asking about my *business matters* with Mrs. Widmer." The letter states "I have no reason for these people [the district attorney's office] to bother me," and concludes "My business is strictly personal and confident [sic]."

In sum, the jury could have concluded that beyond a reasonable doubt Rutherford believed Widmer's tale about her estate despite warnings to the contrary. She viewed the loans to Widmer as "business matters," as evidenced by promissory notes, and she intended to clear a large profit when Widmer received her estate. Rutherford came to trust Widmer as her close friend and there is no evidence that she ever had any doubts about Widmer's story. There is also no evidence that she intended the advances to Widmer to be gifts despite appearances. The proof is sufficient to show that Rutherford was deceived by Widmer's story and Swope's hypothesis that Rutherford actually intended the advances to be gifts is unreasonable under the record. Swope's first point is overruled.

Swope claims by her second point of error that the evidence is insufficient to hold her criminally responsible for Widmer's theft by deception from Rutherford. Swope argues that, although the evidence may connect her to similar extraneous offenses, there is insufficient evidence to link her specifically to Widmer's scheme against Rutherford.

A person is criminally responsible for an offense committed by another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Tex.Pen.Code Ann. § 7.02(a)(2) (1974). To sustain Swope's conviction, the evidence must be sufficient to show that: 1) Swope intended to promote or assist the commission of the offense, and 2) Swope solicited, encouraged, directed, aided, or attempted to aid Widmer to commit the offense.

Although there is ample evidence showing Swope's participation in extraneous offenses very similar to the offense against Rutherford, there is not so much evidence linking Swope directly to the theft from Rutherford. Nevertheless, Swope

took a lead role in instructing Kreimeyer to set up the trust for Widmer's fictional estate. Swope told Kreimeyer the entire story of Widmer's multi-million dollar estate and ultimately asked him to set up the trust and to act as trustee for the estate. At one point, in September 1982, Swope told Kreimeyer that she had Widmer's estate papers, that the money from the estate had been received, and that she would bring the money and papers to Kreimeyer for safekeeping shortly. Kreimeyer, of course, never received any funds or documentation of Widmer's estate.

Swope's car was frequently parked in front of Widmer's house when Rutherford was taken there. Although Swope contends that she may have been visiting her mother, Charity Harton (Widmer's sister), who lived next door to Widmer, this evidence is still probative because Harton was shown to be involved, as well, in Widmer's bogus inheritance scheme.

The evidence is that Swope and her husband received a substantial amount of the funds which Rutherford transferred to Widmer. Two checks, totalling $3F,000, purchased by Widmer with Rutherford's funds, were deposited directly into Swope's business account. Swope's husband used a $9,000 check from Widmer, which was also derived from Rutherford's funds, to make a payment on a loan. Thirty-five thousand dollars of Rutherford's money was lent to Kreimeyer, who gave Swope, in return, a $35,000 promissory note. Swope's husband purchased over $200,000 in cashier's checks payable to the Internal Revenue Service. He paid cash for the checks and much of it was strapped money bearing the seal of Cove State Bank. Other testimony showed that Widmer had received a great deal of strapped cash from Cove State Bank out of Rutherford's cashiers checks. There was proof that Swope was with Widmer when she cashed a cashiers check from Rutherford for $51,832.

Finally, Swope was heavily involved with Widmer in similar schemes to borrow money against Widmer's fanciful inheritance. Swope took a leading role in spreading the myth of Widmer's estate to several potential victims. Evidence of such similar recent incidents is admissible to show knowledge and intent. Tex.Pen.Code Ann. § 31.-03(c)(1), *supra*. Such proof leaves no doubt of Swope's knowledge and intention to participate in Widmer's overall scheme to obtain loans by misrepresenting that Widmer was heiress of a great fortune.

The evidence also shows that Swope encouraged and aided Widmer in committing the offense against Rutherford. Swope acted prominently in instructing Kreimeyer to set up the trust for Widmer. She also attempted to persuade him that the estate was bona fide, by telling him that she had the estate documents and that the proceeds from the estate had been received.

The trust for the mythical estate was an integral part of the scheme to deceive Rutherford into lending Widmer large sums of money. The trust was created on September 15, 1982, less than three weeks before Rutherford and Widmer visited attorney Thompson about a loan. Widmer told Thompson he could verify the estate through its trustee, Kreimeyer. Swope, during this period of time, had been trying to convince Kreimeyer that the estate existed, that she had the documents, and that the funds had arrived. Although Kreimeyer ultimately advised Thompson that he could not verify the existence of the estate, Widmer subsequently used the trust to help her secure the loans from Rutherford. For each loan Widmer received from Rutherford, she gave Rutherford a letter, purportedly sent to Kreimeyer, directing him to pay Rutherford when the estate funds arrived. Swope's acts, helping to create the trust in an effort to verify Widmer's estate, clearly assisted Widmer to commit the offense against Rutherford.

Swope's third point of error is that the district court erred in overruling her motion to quash the indictment which Swope claims was fundamentally defective because it failed to allege any facts to show why appellant was a party to and criminally responsible for Widmer's conduct. Appellant suggests that her third point

presents a novel question of law since she was indicted only as a party to Widmer's offense and that there is no law dealing with the specificity required in an indictment alleging party responsibility.

■ We overrule appellant's third point of error upon the authority of *Pitts v. State*, 569 S.W.2d 898 (Tex.Cr.App.1978). *Pitts* held that "a party to an offense may be charged with the offense without alleging the facts which make the defendant a party to the offense and criminally responsible for the conduct of another." 569 S.W.2d at 900. Subsequent opinions have enlarged the rule in *Pitts*, holding that information pertaining to acts a defendant engaged in, which make him criminally responsible for the conduct of another, is merely evidentiary and need not be alleged in the indictment. *Stein v. State*, 689 S.W.2d 932 (Tex.App.1985, pet. ref'd); *Gantz v. State*, 661 S.W.2d 213 (Tex.App. 1983, pet. ref'd). The indictment is sufficient if it alleges the facts constituting the principal offense.

■ Although the present appeal is different from *Pitts* and its progeny, the *Pitts* rule should nonetheless apply. In this appeal, Swope was indicted only under the law of parties, while in *Pitts*, the defendant was indicted for the underlying offense and then convicted as party to the offense. Nevertheless, the *Pitts* rationale, that allegations in the indictment of the underlying offense are sufficient to put a party defendant on notice of the charges against him, is equally applicable in this appeal. The indictment here involved alleged specific acts by Widmer to which Swope was a party, thereby giving Swope sufficient notice of the charges against her.

Swope's fourth point of error is that the district court committed fundamental error by failing to require the jury to find that Widmer *intentionally* deceived Rutherford. Swope in her fifth point claims, similarly, that the indictment was fundamentally defective because it failed to allege that Widmer *intentionally* deceived Rutherford. Because the charge follows the indictment in virtually identical language,

these two points may be considered together. The State responds that the indictment properly alleged and the charge properly required the jury to find a culpable mental state on the part of Widmer.

Each count of the indictment alleged, with different dollar amounts inserted, that:

> Lorena Love Widmer did then and there unlawfully acquire and exercise control over property, to-wit: money of the value of _____ DOLLARS from Eslar Rutherford without the effective consent of Eslar Rutherford, the owner thereof, and with the *intent to deprive* the said owner of said property *by then and there creating and confirming by words and conduct a false impression of fact* to Eslar Rutherford that was likely to affect and did affect the judgment of Eslar Rutherford in the transaction *which the said Lorena Love Widmer did not believe to be true*, to-wit: that she, the said Lorena Love Widmer, was an heir and beneficiary of an estate yet to be distributed *and by promising performance* to Eslar Rutherford that was likely to affect and did affect the judgment of Eslar Rutherford in the transaction *which the said Lorena Love Widmer did not intend to perform and knew would not be performed,* to-wit: that she, the said Lorena Love Widmer, would use the said money acquired from Eslar Rutherford to pay taxes and claims and legal fees associated with the said estate and that she, the said Lorena Love Widmer, would repay the said money acquired from Eslar Rutherford and Shera Swope, aka Edwina, aka Puff, hereinafter styled the defendant, acting with the intent to promote and assist the commission of the aforesaid offense, did then and there solicit, encourage, direct, aid and attempt to aid Lorena Love Widmer to commit the said offense.

(Emphasis added).

The charge similarly instructed the jury:

> Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that Lorena Love Widmer on or about the

_th day of ____, A.D., 1982, in the County of Lampasas and State of Texas as alleged in Count _ of the indictment did then and there unlawfully acquire or exercise control over property, to-wit: money of the value of _____ DOLLARS from Eslar Rutherford without the effective consent of Eslar Rutherford, the owner thereof, and with the *intent to deprive* the said owner of said property *by then and there creating or confirming by words or conduct a false impression of fact to* Eslar Rutherford that was likely to affect the judgment of Eslar Rutherford in the transaction *which the said Lorena Love Widmer did not believe to be true,* to-wit: that she, the said Lorena Love Widmer, was an heir or beneficiary of an estate yet to be distributed *or by promising performance* to Eslar Rutherford that was likely to affect and did affect the judgment of Eslar Rutherford in the transaction *which the said Lorena Love Widmer did not intend to perform or knew would not be performed,* to-wit: that she, the said Lorena Love Widmer, would use the said money acquired from Eslar Rutherford to pay taxes or claims or legal fees associated with the said estate or that she, the said Lorena Love Widmer, would repay the said money acquired from Eslar Rutherford and Shera Swope, aka Edwina, aka Puff, hereinafter styled the defendant, acting with the intent to promote or assist the commission of the aforesaid offense, did then and there solicit, encourage, direct, aid or attempt to aid Lorena Love Widmer to commit the said offense, you will find the defendant guilty of the offense of Theft Over $20,-000 as alleged in Count I of the indictment and so say by your verdict, but if you do not so believe or if you have a reasonable doubt thereof, you will acquit the defendant of Theft Over $20,000 as alleged in Count I and say by your verdict "Not Guilty". In any event, you will then proceed to consider Count II of the indictment.

(Emphasis added).

In short, the indictment charged Widmer with "creating or confirming a false impression of fact ... which the said Lorena Love Widmer did not believe to be true" and with "promising performance ... which the said Lorena Love Widmer did not intend to perform and knew would not be performed." The charge required that the jury conclude that Widmer committed one of the deceptive acts before it could find Swope guilty.

Points four and five are overruled because the indictment properly alleges and the charge requires the jury to find intentional deception by Widmer. The acts of deception alleged in the indictment and listed in the court's charge could only be done intentionally. Both of the alleged deceptive acts involve the creation by Widmer of false impressions or false promises of performance which Widmer *knew to be false.* The indictment properly alleged and the charge required the jury to find that Widmer acted with culpable intent.

By points of error six, seven and eight Swope maintains that the charge improperly instructed the jury that Widmer had, in fact, committed the deceptive acts upon which the prosecution was based, although she did not object to the charge upon this basis. Swope attacks the emphasized part of the charge.

Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that Lorena Love Widmer on or about the _th day of ____, A.D., 1982, in the County of Lampasas and State of Texas as alleged in Count VII of the indictment did then and there unlawfully acquire or exercise control over property, to-wit: money of the value of _____ DOLLARS from Eslar Rutherford without the effective consent of Eslar Rutherford, the owner thereof, *and with the intent to deprive the said owner of said property by then and there creating or confirming by words or conduct a false impression of fact to Eslar Rutherford that was likely to affect and did affect*

*the judgment of Eslar Rutherford in the transaction which the said Lorena Love Widmer did not believe to be true, to-wit: that she, the said Lorena Love Widmer, was an heir or beneficiary of an estate yet to be distributed or by promising performance to Eslar Rutherford that was likely to affect and did affect the judgment of Eslar Rutherford in the transaction which the said Lorena Love Widmer did not intend to perform or knew would not be performed, to-wit: that she, the said Lorena Love Widmer, would use the said money acquired from Eslar Rutherford to pay taxes or claims or legal fees associated with the said estate or that she, the said Lorena Love Widmer, would repay the said money acquired from Eslar Rutherford* and Shera Swope, aka Edwina, aka Puff, hereinafter styled the defendant, acting with the intent to promote or assist the commission of the aforesaid offense, did then and there solicit, encourage, direct, aid or attempt to aid Lorena Love Widmer to commit the said offense, you will find the defendant Guilty of the offense of Theft Over $20,000 as alleged in Count VII of the indictment and so say by your verdict but if you do not so believe or if you have a reasonable doubt thereof, you will acquit the defendant of Theft Over $20,000 as alleged in Count VII and say by your verdict "Not Guilty". In any event, you will then proceed to consider Count VIII of the indictment.

(Emphasis added).

It appears to this Court that the district court in its charge instructed the jury, in statutory language, of two possible types of deception; creating false impressions of fact or promising false performance. These definitions are then followed by the "to-wit" clauses, which direct the jury to the specific facts to which the jury is to apply the definitions of deception. The "to-wit" clauses do not relieve the jury from the responsibility of applying the definitions to the facts. The charge properly requires the jury to find that Widmer committed one of the acts of deception speci-

fied in the charge. These points of error are overruled.

By her ninth point of error Swope asserts that the district court erred in refusing to instruct the jury that "mere receipt of money from Widmer was not sufficient to show that appellant was criminally responsible for Widmer's alleged theft." Swope advances no authority that would require such an instruction. Moreover, such instruction would have been an impermissible comment on the weight of the evidence. *Chambers v. State,* 700 S.W.2d 597 (Tex.Cr.App.1985); *Plunkett v. State,* 580 S.W.2d 815 (Tex.Cr.App.1979). The point is overruled.

Swope urges by her tenth point that the district court erred in admitting certain hearsay testimony of Glenda Toole. Toole's testimony was to the effect that Rutherford told Toole, in November of 1983, that she wanted her property to pass to her family when she died. The State responds that appellant "opened the door" to this testimony by introducing Rutherford's most recent will which devised her estate to Widmer. In addition, the prosecution had previously introduced Rutherford's earlier will, which devised her estate to members of her family. Accordingly, Toole's testimony was cumulative and harmless.

Swope's eleventh point is that the district court erred in overruling her objection to evidence of an extraneous transaction involving Emmett Cornelius. Swope contends that the State never established that Swope was a party to the transaction. The point is overruled because the transaction was very similar to the events involving Rutherford (*i.e.,* an attempt to borrow money against Widmer's inheritance) and because the evidence does establish Swope's involvement in the Cornelius transaction. Cornelius testified that Widmer and a woman named "Puff" came to his house and asked for a loan. Although Cornelius was unable to make an in-court identification of Swope as "Puff" (he was

seventy-nine and infirm), the record establishes that Swope was known as "Puff."

The district court ordered Swope to make restitution to Rutherford's estate of $511,832, as a condition of parole. The district court's order provides in this respect:

It is further ordered that the Defendant make restitution in the amount of $511,832.00 to the estate of the deceased victim, Eslar Rutherford, and *that the payment of said restitution be made a condition of any parole.* (Emphasis supplied).

The restitution order is the subject of Swope's remaining points of error asserting the order to be an abuse of discretion and a violation of the due process and separation of powers clauses of the Texas and the United States Constitutions.

Texas Code of Crim.P.Ann. art. 42.12 § 15(g)(1) provides:

The Board may adopt such other reasonable rules not inconsistent with law as it may deem proper or necessary with respect to the eligibility of prisoners for parole and mandatory supervision, the conduct of parole and mandatory supervision hearings, or conditions to be imposed upon parolees and persons released to mandatory supervision. Each person to be released on parole shall be furnished a written statement and contract setting forth in clear and intelligible language the conditions and rules of parole. The conditions shall include the making of restitution or reparation to the victim of the prisoner's crime, in an amount not greater than such restitution or reparation as established by the court and entered in the sentence of the court which sentenced the prisoner to his term of imprisonment. The Board may include as a condition of parole that the prisoner pay any fine, cost, or fee, including a fee paid to a county-paid public defender or appointed counsel under Article 26.05 of this code, as amended, that is imposed on the prisoner in the prisoner's sentence. Acceptance, signing, and execution of the contract by the inmate to be paroled shall be a precondition to

release on parole. Persons released on mandatory supervision shall be furnished a written statement setting forth in clear and intelligible language the conditions and rules of mandatory supervision.

Regarding Swope's due process allegations, due process requires that there be a factual basis of record for the amount of restitution ordered. *Cartwright v. State,* 605 S.W.2d 287 (Tex.Cr.App.1980), *Barker v. State,* 662 S.W.2d 640 (Tex.App. 1983, no pet.). Because the sum of restitution ordered equals the total sum of money transferred from Rutherford to Widmer, the due process requirement that a restitution order be supported by evidence is satisfied.

Swope argues, in addition, that she was afforded no notice that she would have to defend against a restitution order. The State responds, correctly, that Swope was charged with notice of the restitution law and the indictment, itself, gave her full notice of the extent of the theft charges against her.

Swope points out that the Constitution of Texas, Art. IV, § 11 vests the executive branch with the power over parole. Accordingly, Swope claims that art. 42.12 § 15(g) infringes on the powers relating to parole vested in the executive branch, and requests this Court to declare art. 42.12 § 15(g) unconstitutional as a violation of the separation of powers provisions of the respective constitutions.

Although Swope attacks the constitutionality of art. 42.12 § 15(g)(1), her real complaint concerns whether the district court's order is violative of the statute. Article 42.12 § 15(g) contemplates that the trial court establish an appropriate sum for restitution. The *Board,* then, as a condition of parole may set a sum not greater than that established by the district court. In the instant appeal, the terms of the district court's order require payment of the total sum of $511,832 as a condition of any parole. Under the statute, it is the Board's responsibility, and not that of the trial court, to set the sum of restitution as

a condition of parole within the figure initially established by the district court.

The district court's judgment is reformed to provide:

It is further ordered that restitution for purposes of Tex.Code of Crim.P.Ann. art. 42.12 § 15(g)(1) be set at $511,832.

The judgment in all other respects is affirmed.

CARROLL, J., not participating.