# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 29, 2016

Lyle W. Cayce
Clerk

No. 15-50405

TESORO REFINING AND MARKETING COMPANY, L.L.C.,

　　　　Plaintiff - Appellant

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA,

　　　　Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, SOUTHWICK, and COSTA, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Tesoro Refining and Marketing Company, L.L.C., sued National Union Fire Insurance Company of Pittsburgh, Pennsylvania, seeking insurance coverage under a commercial crime policy for alleged acts of forgery committed by a Tesoro employee. The district court entered summary judgment for National Union because the policy did not cover Tesoro's losses. Tesoro appealed. We AFFIRM.

No. 15-50405

## FACTUAL AND PROCEDURAL BACKGROUND

Tesoro Refining and Marketing Company, L.L.C., is an independent refiner and marketer of petroleum products. Beginning in 2003, Tesoro sold fuel on credit to a petroleum distributor, Enmex Corporation. In mid-2005, Enmex's credit account with Tesoro was under the supervision of Calvin Leavell, Tesoro's Credit Director. Enmex's account was unsecured with a credit limit of $25 million.[1]

By December 2007, Enmex's balance had grown to approximately $45 million. A Deloitte and Touche auditor conducting Tesoro's year-end review discussed that outstanding balance with Leavell. Leavell represented that the Enmex account was secured by a $12 million letter of credit. The auditor requested documentation a few days later. Shortly after that request, forensic evidence shows that a document purporting to be a $12 million letter of credit was created on the password-protected part of Tesoro's server storing Leavell's documents. Deloitte and Touche received a copy of the $12 million letter of credit. Leavell later denied creating this letter of credit or creating the other fake documents that follow.[2]

Similar events occurred in January 2008. A Tesoro consultant asked Leavell about the Enmex balance. A day later, a document purporting to modify the $12 million letter of credit into a $24 million letter of credit was created in the password-protected part of Tesoro's server storing Leavell's documents. Leavell responded to the Tesoro consultant that it was a "slow paying account" but there was "adequate security." This $24 million letter of credit was later forwarded to Deloitte and Touche. Leavell also referenced

---

[1] In September 2008, Enmex and Tesoro entered into a "Modification and Security Agreement" regarding Enmex's balance, but the parties agree the Enmex account was unsecured until that time.

[2] It is unclear what motivation Leavell would have for creating these fake documents as alleged. Leavell has not been charged with committing any crime.

this $24 million letter of credit in an email to another Tesoro employee, which he then forwarded to Tesoro officers.

By March 2008, Enmex's balance was approximately $59 million. Tesoro's new auditors, Ernst and Young, discussed the Enmex account with Leavell and other Tesoro employees. In May, a document purporting to be a security agreement executed by Enmex in January 2008 was created on the password-protected part of Tesoro's server storing Leavell's documents. Ernst and Young noted both the earlier $24 million letter of credit and this security agreement in its reports.

As Enmex's balance continued to grow and the previous purported letters of credit expired in September 2008, a new $24 million letter of credit was created in the same password-protected part of Tesoro's server as the other documents. Leavell emailed Tesoro's risk management vice president that Tesoro held a $24 million letter of credit for the Enmex account. A PDF version of this letter of credit was added to the Credit Department's file share folder with a Bank of America logo and forged Bank of America representative's signature.

By December 2008, Enmex's balance was $90 million. Tesoro's risk management officer asked for the first time to see the $24 million letter of credit. When Tesoro presented the letter of credit to Bank of America, Bank of America said it was not valid. Tesoro ceased selling fuel to Enmex and sued Enmex for breach of contract and fraud. That lawsuit settled.

Tesoro then submitted a proof of loss to National Union Fire Insurance Company of Pittsburgh, Pennsylvania, under its $15 million commercial crime insurance policy for its losses on the Enmex account. This commercial crime policy was a standard industry policy, which contained different "insuring agreements" covering specific risks like employee theft, forgery and alteration, or computer fraud. Tesoro claimed the loss fell under the "Forgery

and Alteration" insuring agreement. National Union denied coverage. Tesoro submitted an amended proof of loss under the "Employee Theft" insuring agreement. National Union again denied coverage.

Tesoro then sued National Union in the United States District Court for the Central District of California, seeking declaratory relief and bringing claims for breach of contract and bad faith. The lawsuit was transferred to the Western District of Texas. Tesoro moved for partial summary judgment on the coverage question, arguing that language in the "Employee Theft" insuring agreement covered losses due to employee forgery, independent of any theft. National Union moved for summary judgment, or in the alternative, a partial summary judgment on the bad faith claim and punitive damages. The district court granted National Union's motion for summary judgment and denied Tesoro's motion. The district court reasoned that "Employee Theft" did not cover forgery losses independent of a theft and instead always required an "unlawful taking" to trigger coverage. The court then held that Tesoro could not show such a taking had occurred. Tesoro timely appealed.

## DISCUSSION

We review orders granting summary judgment *de novo*. *American Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Interpretation of an insurance contract is a question of law also reviewed *de novo*. *Ryan*, 274 F.3d at 323. The parties agree that Texas law governs the insurance policy in this diversity case. Where the highest state court has not spoken on an issue, as is the case in this appeal, we must make an *Erie* guess as to how that court would decide

the issue. *See Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 243–44 (5th Cir. 2012). We consider intermediate state appellate court decisions in making our *Erie* guess. *Id.* at 244. We first determine the proper interpretation of the "Employee Theft" insuring agreement and then whether summary judgment is appropriate.

### I.     Interpretation of the "Employee Theft" Provision

Under Texas law, we interpret insurance policies using the same rules of interpretation and construction applicable to contracts generally. *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). We must construe the policy such that no provision is rendered meaningless. *Id.* If an insurance contract "is worded so that it can be given a definite or certain legal meaning, [then] it is not ambiguous . . . ." *Id.* Any disagreement about the meaning of the contract does not render it ambiguous; instead, the contract must be "susceptible to two or more reasonable interpretations." *Id.* "[A] contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *RSUI Indem. Co. v. Lynd Co.*, 466 S.W.3d 113, 119 (Tex. 2015). Whether an insurance contract is ambiguous is a question of law. *Schaefer*, 124 S.W.3d at 157. If we determine a contract is ambiguous, we must adopt the interpretation favoring the insured. *RSUI Indem.*, 466 S.W.3d at 118.

The specific insuring agreement relevant to this dispute is Paragraph A.1 of National Union's policy, which covers "Employee Theft" and states:

> We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

> For the purposes of this Insuring Agreement, "theft" shall also include forgery.

The policy provides that words and phrases in quotation marks are defined terms. In the definitions section of the policy, "theft" is defined as "the unlawful taking of property to the deprivation of the Insured." The last sentence of the "Employee Theft" insuring agreement, which states that "'theft' shall also include forgery," forms the basis for the parties' disagreement.

Tesoro claims the district court erred by requiring an "unlawful taking" to create coverage under this insuring agreement. In Tesoro's view, the sentence addressing forgery creates coverage for losses from any employee forgery, independent of any "unlawful taking." Tesoro argues that the language "shall also include" means the definition of "theft" is being expanded to include "something new and different," that is, forgery.

Quite differently, National Union argues that the "Employee Theft" insuring agreement always requires a showing that theft, defined as an "unlawful taking," has occurred. The word "include" as used in the sentence addressing forgery, National Union contends, simply means that a forgery that is within the category of "theft" is also covered. It does not create coverage for a forgery wholly distinct from "theft."

National Union argues that the sentence was helpful in avoiding confusion that could be created by two other policy provisions: the "Forgery or Alteration" insuring agreement and an "Acts of Employees" coverage exclusion. The "Forgery Or Alteration" insuring agreement covers limited kinds of forgery involving commercial paper. A coverage exclusion in Paragraph D.1.c removes coverage for any employee acts except those covered under Paragraph A.1, i.e. "Employee Theft." National Union claims that the sentence addressing forgery ensures that employee thefts effectuated by

6

forgery are covered under "Employee Theft." National Union asserts that without this sentence, confusion would exist about whether employee thefts effectuated by forgery would be covered because the "Acts of Employees" exclusion removes any employee forgeries from coverage under the "Forgery Or Alteration" insuring agreement.

Both parties rely on Texas cases to interpret the language. One case involved a policy covering death "while driving or riding in 'a private automobile of pleasure car design,'" which "includ[ed] station wagon[s] or similar body types . . . ." *Prudential Ins. Co. of Am. v. Lucas*, 456 S.W.2d 429, 430 (Tex. Civ. App.—Austin 1970, writ ref'd n.r.e.). The court concluded that a pickup truck was covered as a "private automobile of pleasure car design" because "include" expanded coverage beyond just the listed examples. *Id.* at 432–33. Implicit in the court's reasoning was that a pickup truck was still a kind of "automobile."[3] National Union argues that "include" in its policy similarly did not expand coverage to forgeries that are wholly outside the category of "theft." The district court agreed, holding that the policy unambiguously requires an "unlawful taking" for coverage under the "Employee Theft" insuring agreement.

Tesoro finds support for its different view in a Texas case in which a policy covered accidents "arising out of garage operations," including "Automobile Hazard 1." *Farmer Enters., Inc. v. Gulf States Ins. Co.*, 940 S.W.2d 103, 107 (Tex. App.—Dallas 1996, no pet.). The policy defined "Automobile Hazard 1" to include an individual driving a company car with the insured's permission. *Id.* The Texas appellate court held that the garage

---

[3] The policy's definition of "private passenger automobile" was a "private automobile of pleasure car design (including station wagon or similar body types) not in use for commercial or occupational purposes . . . ." *Lucas*, 456 S.W.2d at 431. The court did not expressly state that the pickup truck met this definition, but did consider whether the pickup truck was functioning similarly to a station wagon or otherwise being used to carry private passengers.

operations policy could cover an individual driving a company car with the insured's permission, even though such activity was not within an ordinary understanding of hazards arising from garage operations. *Id.* at 109–10. Among the distinctions we see from our case is that "garage operations" was an undefined term. It "includ[ed]" defined provisions, though, at least one of which was arguably inconsistent with what would generally be understood as operations involving a garage. *See id.* at 107. In our case, the "Employee Theft" insuring agreement is the opposite. "Theft" is a defined term. The disputed sentence – "'theft' shall also include forgery" – begins with a defined term that is followed by an undefined term. The fact that "theft" was already defined helps prevent the reference to forgery from expanding the definition. Unlike in *Farmer Enterprises*, "theft" was not an empty vessel in which meaning would be found largely in the additional terms. Instead, the definition of "theft" gave meaning to the subsequent term.

Tesoro's interpretation isolates the sentence addressing forgery from its context. Context is key and can in part be provided by a document's title. *RSUI Indem.*, 466 S.W.3d at 118, 121. This insuring agreement is titled "Employee Theft." "[C]ourts should construe contractual provisions in a manner that is consistent with the labels the parties have given them." *Id.* at 121. When an "Employee Theft" insuring agreement contains a sentence explaining that "theft," a defined term, shall also include forgery, that sentence is making clear that a forgery that leads to "theft" is covered. Tesoro cannot explain why any employee forgery, as opposed to fraud or other forms of dishonesty, would be covered under this "Employee Theft" insuring agreement.

National Union's interpretation, namely, that forgery must be theft-like, does not render the sentence addressing forgery meaningless. We have already discussed one explanation for this sentence: a possible need for

clarification that employee theft effectuated by forgery is covered under the policy. There may be other compelling explanations. More fundamentally, a sentence is not rendered meaningless because it is interpreted as illustrative. *See Lucas*, 456 S.W.2d at 432 (finding "including" clause illustrative but not treating it as superfluous). Furthermore, we agree with National Union that Tesoro's interpretation would nullify the "Acts of Employees" exclusion when applied to the "Forgery Or Alteration" insuring agreement. We do not consider it reasonable to read the policy as excluding all employee forgery involving commercial paper from the "Forgery or Alteration" insuring agreement, only then to include all kinds of employee forgery under the "Employee Theft" insuring agreement.

Because Tesoro's interpretation would ignore the express definition of "theft" under the policy and apply the "Employee Theft" insuring agreement to conduct that is not theft, we find such an interpretation unreasonable. Instead, the policy is unambiguous. To trigger coverage under the policy, Tesoro must show that an "unlawful taking" occurred. We turn now to whether summary judgment was appropriate on that question.

## II.    *"Unlawful Taking" Coverage*

The district court held that National Union was entitled to summary judgment because Tesoro could not create a genuine dispute of material fact as to whether Leavell committed an "unlawful taking." The parties took differing positions on what "unlawful taking" meant under the policy. The district court decided that an "unlawful taking" was "the act of seizing or otherwise exercising control over an article such that possession or control of the article is transferred without the owner's authorization or consent." Applying this definition to Tesoro's evidence, the district court found that

Tesoro could not establish a genuine dispute of material fact as to whether Leavell unlawfully took any of Tesoro's property.

Before we address Tesoro's arguments on appeal, we discuss how to characterize the property that Tesoro claims it lost. Tesoro's appellate brief inconsistently describes its loss as its physical property, i.e. the fuel it sold, or its extension of unsecured credit to Enmex when it sold the fuel. National Union briefly responds to this inconsistency by noting that if the lost property is the fuel, Tesoro suffered no real loss because in exchange for its fuel it received what it bargained for, binding commitments from Enmex to pay for that fuel. If the lost property is the extension of credit to Enmex, those accounts receivable are not recoverable under the policy because such accounts are "intangible property." The district court, in a footnote, acknowledged this issue and decided that the "loss" was the credit extended to Enmex. Due to the nature of our resolution of this appeal, we do not need to characterize Tesoro's losses. For purposes of our analysis, we refer to the loss as Tesoro's sale of the fuel.

We now turn to the parties' arguments about the meaning of "unlawful taking." Tesoro contends that any act qualifying as theft under Texas criminal law is sufficient to create coverage, and Leavell committed theft by deception here. The district court gave "unlawful taking" an ordinary dictionary meaning, requiring some seizure or exercise of control over the property. National Union accepts that definition.

We may affirm on any ground supported by the record, even if it was not relied on by the district court. *See United States ex rel. Cal's A/C & Elec. v. Famous Constr. Corp.*, 220 F.3d 326, 329 & n.11 (5th Cir. 2000). We resolve this case by determining whether Tesoro has created a genuine dispute of material fact that precludes summary judgment, assuming arguendo that its definition of "unlawful taking" applies. Under Tesoro's

theory, an unlawful taking is any theft under Texas law, including theft by deception as Tesoro urges occurred here.  The Texas Penal Code defines theft by deception in the following way.  First, theft occurs when one "unlawfully appropriates property with intent to deprive the owner of property."  TEX. PENAL CODE ANN. § 31.03(a).  Property is unlawfully appropriated when, relevant here, "it is without the owner's effective consent . . . ."  *Id.* § 31.03(b)(1).  "Consent is not effective if . . . induced by deception or coercion . . . ."  *Id.* § 31.01(3)(A).

Texas caselaw makes clear that theft by deception requires "that the owner of the misappropriated property was induced to consent to its transfer because of [the] deceptive act of the" wrongdoer.  *See, e.g.*, *Fernandez v. State*, 479 S.W.3d 835, 838 (Tex. Crim. App. 2016); *Swope v. State*, 723 S.W.2d 216, 223 (Tex. Ct. App.—Austin 1986), *aff'd* 805 S.W.2d 442 (Tex. Crim. App. 1991) (en banc); *Demond v. State*, 452 S.W.3d 435, 453 (Tex. Ct. App.—Austin 2014), *pet. ref'd* (Mar. 18, 2015).  This requirement that the victim rely on the deception comes from the statute's definition of consent as not effective when *induced* by deception.  *See Swope*, 723 S.W.2d at 223.  "The reliance need not be the sole, or even controlling, reason why the victim decided to provide [his consent], but it must be a substantial or material factor in the decision-making process."  *Demond*, 452 S.W.3d at 453 (alteration in original).

We recognize that Texas criminal caselaw involves a different burden of proof and standard of review than we have before us.  Yet, we find a brief review of some of this caselaw helpful in understanding what kind of acts constitute theft by deception, which Tesoro urges Leavell committed.

In *Fernandez*, the Texas Court of Criminal Appeals found sufficient evidence of inducement when the defendant, a justice of the peace, obtained a travel voucher for personal use by failing to correct the impression he had previously made to the county that the travel was for county business.

*Fernandez*, 479 S.W.3d at 836, 839.  The defendant originally directed his chief deputy clerk to use his county-issued credit card to purchase a ticket for a work conference.  *Id.*  The county auditor received documentation showing the trip was for county business.  *Id.* at 839.  The ticket was ultimately converted into a travel voucher because the defendant could not make the trip.  *Id.*  When the defendant later used the travel voucher for private use, he never corrected the initial impression he made to the chief deputy clerk or county auditor.  *Id.*

In another criminal case, *Demond,* an intermediate Texas appellate court vacated a conviction for theft by deception because there was insufficient evidence of inducement.  452 S.W.3d at 455–56.  The case involved a law firm partner and his client's general manager who conspired to have the law firm hire two individuals as outside consultants, one of whom was the general manager's brother.  *Id.* at 441.  The general manager would funnel money to the two individuals by having the law firm bill the client for their "services." *Id.* The complex billing scheme kept the identities of the two individuals hidden from the client.  *Id.* at 441, 454.

The court explained that a showing of inducement required evidence that had the client known these two individuals were receiving payments, it would not have consented to the payments.  *Id.* at 454.  Testimony at trial showed that potentially the situation could have been reported to the board of directors.  *Id.* at 455. Employee morale would have lowered because hiring relatives was generally prohibited.  *Id.*  Three current and former directors testified they would have wanted to know the payments were going to these two individuals.  *Id.*  A former director testified he would have been angry if he had known.  *Id.*  The court concluded this testimony was insufficient to show "the board would have stepped in and blocked these payments" or otherwise changed company policy to prevent the situation from recurring.

*Id.* Instead, the main consequence of the deception was "frustration," rather than consent to payment. *Id.*

From these cases, we distill the following principles. In *Fernandez*, the chief deputy clerk and the county auditor, who both were involved with issuing the defendant the travel voucher, were under the erroneous impression that it was for county business. 479 S.W.3d at 839. Accordingly, and as a matter of common sense, those who consent to the transfer must be aware of the deceptive representation in order to be induced by it. Similarly, *Demond* instructs that inducement requires that the decision-makers would have acted differently had they known the truth. 452 S.W.3d at 454–55. The deception needs to be at least a "substantial or material factor in the decision-making process." *Id.* at 453.

We now consider whether Tesoro has offered evidence to create a genuine dispute of material fact as to whether Leavell committed theft by deception under Texas law. We assume for purposes of our analysis that Leavell created the forged letters of credit and security agreement.[4]

Tesoro claims Leavell's "'appropriation' was to 'exercise control' over Tesoro's fuel through his influence as Director of Credit who produced forged collateral and 'brought about a transfer' that was 'unlawful' because it was 'induced by deception.'" Tesoro does not explain in its brief how, factually, the forged letters of credit and security agreement induced Tesoro to continue selling fuel to Enmex or what evidence supports this assertion. It certainly does not identify any evidence that would support such inducement. Later in its brief, Tesoro cites evidence to support a separate argument that Leavell exercised control over the fuel under the district court's definition of

---

[4] The parties do the same. The policy does not require the employee who committed the unlawful taking to be identified for coverage to exist. Paragraph A.1 covers theft "by an 'employee,' whether identified or not . . . ."

"unlawful taking," rather than under its theft-by-deception theory.  We consider whether this evidence supports inducement under Tesoro's theft-by-deception theory as it is the only evidence Tesoro cites.

There is evidence that Leavell had authority to extend, deny, or adjust credit for Enmex.  Outside auditors reviewed the Enmex account and relied on the forged documents in audit reports.  In notes for a due diligence meeting with the auditors and some of Tesoro management, Leavell referenced the forged security documents.  Leavell mentioned one of the letters of credit in emails with a Tesoro consultant, who was inquiring about the status of account receivables.  Leavell falsely stated in two trade receivable aging reports that the Enmex account was "partially secured."  These reports were sent to the Tesoro treasurer, who oversaw the credit department.  Leavell mentioned a forged letter of credit to the Tesoro CFO in an email about account receivables.

For the deception to have induced its consent, Tesoro has to show that the forged security documents were a "substantial or material factor" in its decision to continue selling Enmex fuel.  We cannot ascertain how the evidence Tesoro offers about what Leavell did would have affected its decision-making process in selling fuel to Enmex because Tesoro has never explained how that process works.  There is no evidence about how sales of fuel to customers are authorized or eventually cancelled, or who has the ultimate decision-making power in authorizing sales of fuel.  Tesoro's evidence at best shows Leavell mentioned the forged security documents to outside auditors, a Tesoro consultant, a CFO, and the treasurer.  Tesoro failed to offer any evidence of how these communications affected its decision

14

to continue selling fuel to Enmex.[5]  No one testified, for example, that absent the forged documents the sales would not have occurred.

Among the problems with this evidentiary deficit is that what is in evidence creates doubt that the forgeries necessarily mattered to Tesoro's decision to sell fuel to Enmex.  The record shows that, for whatever reason, Enmex was a sufficiently valued customer that at times in which Tesoro certainly should have known of its security shortfalls with the company, sales occurred anyway.  Tesoro's corporate representative stated in his deposition that Tesoro officers had already authorized Enmex to run up a balance that was at least $15 million over its unsecured credit limit of $25 million, before any of these forged security documents were created.  Additionally, the corporate representative said that in September 2008, the two initial forged letters of credit expired and at that point became valueless.  For a month after that, before Leavell forged a new letter of credit, Tesoro continued to sell fuel to Enmex.  The expired letters of credit were available for any Tesoro officer to review, but none ever looked at them.  Accordingly, during the month when the account appeared unsecured, as it was in reality, Tesoro continued to sell fuel to Enmex.  This evidence contradicts any assertion by Tesoro that it would have acted differently had it known the letters of credit were forged and valueless because when the forged letters of credit expired and were valueless on their face, Tesoro did not act any differently.

In sum, Tesoro failed to offer any evidence that it would have acted differently had it known the Enmex account was actually not secured.  Tesoro discusses no company policy or statement from a decision-maker that Tesoro

---

[5] It seems possible, and even likely, that as a general matter security documents play a part in a business's decision to sell to customers on credit.  The problem is that Tesoro failed to meet its evidentiary burden to offer some evidence that the forged security documents were a "substantial and material" factor in its decision in this particular case.

would not have continued to sell fuel to Enmex on an unsecured basis on these facts. In fact, the evidence indicates otherwise.

The Texas caselaw addressing theft by deception makes clear that the decision-maker must be aware of the false statement and induced by it. Tesoro has failed to connect any of the evidence of Leavell mentioning these forged security documents to Tesoro's decision-making process in selling fuel to Enmex, let alone show that the forged documents induced the sale. Accordingly, even if we were to accept Tesoro's meaning of "unlawful taking," Tesoro cannot survive summary judgment because it has failed to show a genuine dispute of material fact as to whether a theft by deception occurred.

AFFIRMED.

16