**REVERSED and REMANDED and Opinion Filed March 13, 2023**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00286-CV**

**RYAN, LLC, Appellant**
**V.**
**NATIONAL UNION FIRE INSURANCE COMPANY**
**OF PITTSBURGH, PA, Appellee**

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-05755**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Goldstein, and O'Neill[1]
Opinion by Justice O'Neill

Appellant Ryan, LLC appeals the trial court's take-nothing judgment in favor of appellee National Union Fire Insurance Company of Pittsburgh, PA (National Union), which the trial court entered after granting National Union's motion for summary judgment and denying Ryan's partial motion for summary judgment. For the reasons discussed below, we reverse and remand.

---

[1] The Hon. Michael J. O'Neill, Justice, Assigned.

## Factual and Procedural Background

Ryan is a global tax services firm that provides clients with a range of tax advisory and consulting services. Its principal place of business is in Dallas, Texas. Sean Weaver was employed by Ryan as a director in its Transaction Tax Practice Group in Arlington, Virginia, between 2011 and 2015. The Transaction Tax Practice Group specialized in analyzing transactions of major corporations to identify transactions that resulted in the overpayment of sales and use taxes to state and local taxing authorities. When overpayments were identified, Weaver, along with the employees he supervised, submitted refund claims to state and local authorities on the clients' behalf. The clients paid Ryan a professional fee for these services based on a percentage of the refunds recovered. Ryan then paid commissions or bonuses to its employees based on the amount of professional fees it received.

In a scheme to secure higher commissions for himself, Weaver submitted fraudulent tax returns on behalf of some of Ryan's clients to the Virginia Department of Taxation, the Texas Comptroller of Public Accounts, and the State of Florida. This occurred between October 2011 and December 2014. As a result, Ryan's clients received refund amounts to which they were not entitled, Ryan received professional fees to which it was not entitled, and some of Ryan's employees, including Weaver, received bonuses or commissions to which they were not entitled.

In December 2014, Ryan's internal procedures uncovered irregular activities in Weaver's work, which prompted further investigation and led to the discovery of

Weaver's scheme. Weaver was immediately terminated, and Ryan notified the affected clients and relevant authorities. Ryan determined that it had paid Weaver $346,612 in unearned commissions due to Weaver's scheme. Weaver admitted he acted alone and, ultimately, he pleaded guilty to mail fraud and money laundering and was sentenced to seventy-one months (almost six years) in federal prison.

Ryan had previously purchased an insurance policy from National Union, titled "Management Liability, Professional Liability, Crime Coverage and Kidnap and Ransom/Extortion Coverage for Private Companies." The policy was effective from September 1, 2014, through September 1, 2015. After Ryan discovered Weaver's scheme, Ryan filed a claim with National Union seeking to recover its losses under the Crime Coverage Section.[2] Ryan sought coverage for amounts that fall into five categories of losses: (1) $2,091,566 in bonus and commission compensation paid to Weaver and other employees; (2) $3,934,083.85 spent on internal employee labor and expenses to investigate Weaver's fraud; (3) $777,243.59 paid to outside vendors for assistance with forensic analysis and data hosting needed to investigate Weaver's fraud; (4) $1,095,140 paid to the Texas Comptroller to resolve Ryan's potential liability for the improper refund amount the Comptroller issued to one of Ryan's clients and that needed to be repaid; and (5) $3,129,227.47 in lost professional fees that Ryan either waived or paid back to its affected clients.

---

[2] According to a June 30, 2017 letter sent by National Union to Ryan, National Union paid Ryan over $7 million under its Professional Liability coverage.

National Union denied Ryan's claim on April 27, 2017, stating that there was no coverage under the policy for the losses suffered by Ryan. However, National Union did offer, "under a complete reservation of rights, to reimburse Ryan for the net loss it incurred in connection with the commissions paid to [Weaver]."

Ryan filed suit against National Union asserting claims for breach of contract and violations of Chapters 541 and 542 of the Texas Insurance Code. *See* TEX. INS. CODE ANN. §§ 541.060 (listing unfair settlement practices, such as making misrepresentations, failing to make a good faith effort to settle a claim, failing to promptly provide a reasonable explanation for denial of coverage, or refusing to pay a claim without conducting a reasonable investigation); 541.061 (listing ways insurer can misrepresent an insurance policy); 542.058 (providing for damages when insurer fails to promptly pay insurance claim). National Union moved for summary judgment on both no-evidence and traditional grounds, arguing that it was entitled to judgment as a matter of law because: (1) Ryan could not meet its burden of proof to establish that coverage existed under the policy; specifically, Ryan could not prove there was a "theft" because there was no "taking" of Ryan's property by Weaver; (2) Ryan could not meet its burden to prove that the purported "money, securities, and other property" was covered because Ryan did not own the money and any repayment or return was not an actual loss but instead a disgorgement; (3) Ryan could not prove there was any direct loss from the alleged "theft" and, plus, the indirect loss exclusion barred Ryan's recovery of income it failed to earn but

expected, payment obligations owed to third parties, and payments made to investigate Weaver; (4) because Ryan could not establish coverage, it could not recover on its statutory violation claims under the insurance code; and (5) even if Ryan established coverage, Chapter 542 did not apply because the policy was a fidelity bond, exempting it from the prompt payment requirement, and Ryan had no evidence that National Union violated the insurance code. Ryan moved for partial summary judgment seeking judgment that Weaver's actions did constitute a "theft" and that Ryan's losses resulted "directly from" Weaver's theft.

On March 2, 2022, the trial court denied Ryan's motion for partial summary judgment without further explanation. Subsequently, the trial court granted National Union's motion and entered a take-nothing judgment in its favor. This appeal followed.

On appeal, Ryan presents the following issues for our review: whether the trial court erred in granting National Union's traditional and no-evidence motions for summary judgment, and in denying Ryan's cross-motion, as to (1) the existence of coverage under the policy; and (2) Ryan's claims under Chapters 541 and 542 of the Texas Insurance Code. Within its first issue, Ryan presents the following questions: (a) did Weaver commit "theft" through is scheme to secure inflated bonus payments by submitting fraudulent tax returns?; (b) were Ryan's losses a direct result of Weaver's theft?; and (c) did the indirect loss exclusion bar coverage?

## Summary Judgment Standard of Review

We review a summary judgment de novo. *Trial v. Dragon*, 593 S.W.3d 313, 316 (Tex. 2019). When a motion for summary judgment contains grounds for both a traditional summary judgment and no-evidence summary judgment, we generally consider the no-evidence ground first. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). However, "purely legal issues can never be the subject of a no-evidence motion for summary judgment." *Harrill v. A.J.'s Wrecker Serv., Inc.*, 27 S.W.3d 191, 194 (Tex. App.—Dallas 2000, pet. dism'd w.o.j.).

Here, the parties agreed that their cross-motions would be limited to legal issues and that any remaining discovery regarding fact issues would be conducted after resolution of the cross-motions. The discovery conducted prior to the cross-motions was limited to information needed by the parties to address the key legal issue of whether there was coverage under the policy. Therefore, in this circumstance, we decline to address National Union's no-evidence motion first and, instead, look to whether the trial court erred in granting National Union's, and in denying Ryan's, traditional motions for summary judgment regarding whether there was insurance coverage.

A traditional motion for summary judgment requires the moving party to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). If the movant carries this burden, the burden shifts to the nonmovant

–6–

to raise a genuine issue of material fact. *Lujan*, 555 S.W.3d at 84. We take evidence favorable to the nonmovant as true, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 131 (Tex. 2019).

**Insurance Coverage for "Theft"**

In an insurance coverage dispute, the insured initially bears the burden to establish coverage under the policy at issue. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). Therefore, we first turn to whether Weaver's actions constituted a "theft" under the Crime Coverage section of the policy, which the parties disputed in their competing motions.

When interpreting an insurance policy to ascertain the parties' intent, we construe the policy according to general rules of contract construction. *Id.* at 126. We first look to the language of the policy itself. *Id.* We examine and consider the entire policy in an effort to harmonize and give effect to all its provisions so that none will be rendered meaningless. *Id.* "We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). Thus, when a policy defines its terms, those definitions control. *Evanston Ins. Co. v. Legacy of Life Inc.*, 370 S.W.3d 377, 381 (Tex. 2012).

–7–

We are also mindful of other courts' interpretations of policy language that is identical or very similar to the language at issue, as "[c]ourts usually strive for uniformity in construing insurance provisions" that "are identical across the jurisdictions." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 522 (Tex. 1995) (per curiam)).

Ambiguity does not exist simply because the parties disagree over a term's meaning and present different interpretations of the agreement. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009); *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). If a policy term is susceptible to more than one reasonable interpretation, we must resolve that uncertainty in favor of the insured. *Evanston*, 370 S.W.3d at 380.

Here, the Crime Coverage Section of the policy at issue provides for coverage of "Employee Theft," which is defined as follows: "The Insurer will pay for loss of or damage to Money, Securities and Other Property resulting directly from Theft committed by an Employee, whether identified or not, acting alone or in collusion with other persons." "Theft" is defined as "the unlawful taking of Money, Securities or Other Property to the deprivation of the Insured." And "Money" is defined in relevant part as "currency, coins and bank notes in current use and having a face value."

Ryan argues that, at the very least, there was a theft when Weaver took commissions from Ryan that he did not earn. The parties do not dispute that Weaver was paid commissions to which he was not entitled and that such commissions are "money" as defined by the policy. However, the parties do not agree that Weaver committed a "theft" as defined by the policy. National Union maintains that Weaver did not unlawfully take money from Ryan but that, instead, he started a chain reaction that caused money to improperly flow from the taxing authorities to Ryan's clients, to Ryan, and then to Weaver and other employees. In support of its argument, National Union points to the fact that Weaver was not convicted of theft but was instead convicted of mail fraud and money laundering.

While the policy defines theft as "the unlawful taking of Money . . . to the deprivation of the Insured," the policy does not define "unlawful" or "taking," so we must give those terms their plain, ordinary meaning. Merriam-Webster defines "unlawful" as "not lawful," "not morally right or conventional," "not authorized or justified by law," and "contrary to or in defiance of the law." *Unlawful*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/unlawful. It defines "taking," in relevant part, as "to get into one's hands or into one's possession, power, or control." *Taking*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/taking. Black's Law defines "take" as "[t]o lay hold of; to gain or receive into possession; to seize; to deprive one of the possession of; to assume ownership" and "[t]o obtain or assume possession of a chattel unlawfully,

–9–

and without the owner's consent." *Take*, BLACK'S LAW DICTIONARY, https://thelawdictionary.org/take/.

National Union relies on *Tesoro Refinancing & Marketing Co. LLC v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 96 F. Supp. 3d 638 (W.D. Tex. 2015) (order), *aff'd on other grounds*, 833 F.3d 470 (5th Cir. 2016), for support of its contention that there was no theft and, thus, no coverage under the Crime Coverage Section. The crime coverage policy concerning employee theft at issue here was the same language at issue in *Tesoro*. *Id.* at 645. Tesoro sold fuel to a petroleum distributor on credit. *Id.* at 641–42. The petroleum distributor's credit balance grew to approximately $45 million and raised concerns. *Id.* at 642. Tesoro believed that, due to the concerns, its credit manager falsified letters of credit and presented them to Tesoro and its auditors to alleviate any concerns by making Tesoro believe the account was adequately collateralized when it was not. *Id.* at 642–43, 648. Eventually Tesoro discovered that the most recent letter of credit was invalid and stopped selling fuel to the petroleum distributor. *Id.* at 643. Tesoro submitted an insurance claim to National Union under its employee theft coverage, which National Union denied. *Id.*

In interpreting what "unlawful taking" meant, the district court relied upon dictionary definitions, as well as definitions in the Texas Penal Code. *Id.* at 647–48; *see* TEX. PENAL CODE ANN. § 31.03(a) ("A person commits an offense [theft] if he unlawfully appropriates property with intent to deprive the owner of property.").

–10–

Ultimately, the court found that "the plain meaning of 'unlawful taking' under Texas law is the act of seizing or otherwise exercising control over an article such that possession or control of the article is transferred without the owner's authorization or consent." *Id.* at 648. Based on the plain meaning of "unlawful taking," the court concluded that Tesoro's manager did not commit theft because he never seized or exercised control over the fuel sold to the petroleum distributor. *Id.* at 648–49.

Ryan argues that applying *Tesoro*'s plain meaning of "unlawful taking" to the facts here does not support National Union's argument because Weaver did seize or exercise control over Ryan's money when he took $346,612 in unearned commissions. We agree.

National Union also argues that Weaver's taking of the commission payments was not unlawful because Ryan consented to pay him. However, Ryan's President of U.S. Operations testified by affidavit that had Ryan known Weaver was submitting fraudulent claims, Ryan would not have consented to pay Weaver bonuses that resulted from his scheme. Ryan points us to *Whitney Equipment Co., Inc. v. Travelers Casualty and Surety Co. of America*, 431 F. Supp. 3d 1223 (W.D. Wash. 2020) (order), as an example of how employee theft can occur when an employee manipulates financial data to trigger the employer's bonus policy, which results in the employee receiving a bonus she did not earn. The district court

explained the meaning of "theft," which was defined in the policy with language almost identical to our definition here,[3] as follows:

> The average person purchasing insurance would read this definition to include [the employee's] conduct. [The employee] set out to enrich herself at [the employer's] expense, intentionally manipulating the company's financial data to "earn" payments to which she had no right. Although her scheme was more complicated than reaching into the till to grab some cash or turning in a fraudulent vendor receipt to pocket the money, if the contract terms are given their fair, reasonable, and sensible construction, [the employee] intentionally and unlawfully took [the employer's] money.

*Id.* at 1226. We agree that an "unlawful taking" includes taking by deception.

National Union argues that *Whitney* is distinguishable from this case because Weaver did not take from Ryan or set out to enrich himself at Ryan's expense. National Union maintains that Ryan did not own the money at issue here; the taxing authorities did. And, thus, if Weaver took from anyone, he took from the taxing authorities, not Ryan.

In addition to the policy providing that the definition of "Theft" is "the unlawful taking of Money, Securities or Other Property to the deprivation of the Insured," the policy also provides that the property covered is limited to property "[t]hat the Insured owns or leases" or "[t]hat the Insured holds for others whether or not the Insured is legally liable for the loss of such property." Ryan argues that National Union waived its argument that Ryan did not own the money it paid Weaver

---

[3] The Travelers policy defined "theft" as "the intentional unlawful taking of Money . . . to the Insured's deprivation." *Whitney*, 431 F. Supp. 3d at 1225.

because National Union failed to plead it as an affirmative defense. Assuming without deciding that National Union preserved this argument, we conclude that Ryan owned the money at issue and, thus, Weaver took the commission payment to the deprivation of Ryan.

It is undisputed that Ryan paid employees, including Weaver, commissions and bonuses based on professional fees it received or it expected to receive. However, the fact that the amount paid was based on professional fees Ryan believed it earned but paid back or waived due to the discovery of Weaver's scheme does not change Ryan's ownership rights to the money it paid Weaver. Ryan had care, custody, and control of the money it paid Weaver and caused such money to be transferred to Weaver from Ryan. Therefore, when Ryan paid Weaver his $346,612 commission, Weaver took from Ryan money Ryan owned and money Weaver knew he did not earn.

We conclude that the $346,612 paid to Weaver was an unlawful taking by Weaver to the deprivation of Ryan and, thus, there is coverage under the Employee Theft provision of the policy. We decline to address the remaining questions presented and remand to the trial court for further proceedings consistent with this opinion. We reach this decision due to the fact that the trial court could not have entered final judgment on Ryan's breach of contract claim or its claim that National Union violated Chapters 541 and 542 of the Texas Insurance Code if it found that coverage existed. Therefore, the trial court should be given an opportunity to first

decide what standard should apply to determine whether Ryan's remaining alleged losses were losses "resulting directly from" Weaver's theft of $346,612 and, after an adequate time for discovery, what alleged losses meet that standard or are barred by the indirect loss exclusion. Because we have concluded that there is coverage under the policy, the trial court should also be given an opportunity to consider the parties' arguments concerning the alleged statutory violations.

## Conclusion

We sustain Ryan's first issue as it pertains to whether there was coverage under the Employee Theft provision of the Crime Coverage policy. Having found that Weaver committed theft by unlawfully taking $346,612 in commissions, we reverse the trial court's take-nothing judgment in favor of National Union and remand this case to the trial court for further proceedings consistent with this opinion.


/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE, ASSIGNED

220286F.P05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

RYAN, LLC, Appellant

No. 05-22-00286-CV     V.

NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PA, Appellee

On Appeal from the 191st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-18-05755.
Opinion delivered by Justice O'Neill.
Justices Pedersen, III and Goldstein
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED**, and this cause is **REMANDED** to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellant RYAN, LLC recover its costs of this appeal from appellee NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

Judgment entered this 13th day of March 2023.